UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-00138-2-LRR |
| | ) | |
| JALEL AOSSEY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT JALEL AOSSEY'S SENTENCING MEMORANDUM

Defendant Jalel Aossey, by and through his attorneys, THEODORE T. POULOS and MARTY BASU, respectfully submits the following sentencing memorandum.

## I.  INTRODUCTION

Jalel Aossey owes much of his success as a businessman, family man, and overall respected position in the community to his father's example.  It is, therefore, ironic that Mr. Aossey is now before the Court due in large part to his father's misguided conduct.   To be sure, Mr. Aossey is his own person and takes full and complete responsibility for his actions and inactions at Midamar, Incorporated ("Midamar") and Islamic Services of America ("ISA"). Mr. Aossey understands that his own actions are what have placed him before this Court.   But, as explained below, his father cast an imposing shadow over both companies that contributed to some of Mr. Aossey's costly failures in judgment.   Mr. Aossey will forever regret that he did not abide by the honorable principles that have been a hallmark of his life.

Mr. Aossey pleaded guilty to one count of conspiracy pursuant to a written plea agreement and he now awaits the judgment of this Court with great anxiety.  He has fully acknowledged and accepted responsibility for his conduct.   Moreover, he has done all he can to

atone for it.

The parties disagree as to the Sentencing Guidelines calculation, as detailed below and more fulsomely in Defendant's Brief Regarding Outstanding Sentencing Issues. But beyond the final calculated advisory sentencing range, we also respectfully request that the Court give substantial weight to several highly significant mitigating factors. ***First***, while Mr. Aossey readily acknowledges his complicity in the charged scheme, he has taken numerous steps to rectify the damage his actions have caused. That includes, first and foremost, making sure that Midamar make a prompt and substantial forfeiture payment of $600,000. Mr. Aossey also spearheaded the creation of Midamar and ISA's compliance programs, increasing those companies' overall interactions with the USDA and other regulatory bodies in the United States and abroad, and doing all that he can to make sure nothing like this ever happens again. Mr. Aossey has also agreed to separate from Midamar, the company his father started and the company he has helped run for the last five years. As a result of his transgression, Mr. Aossey will never again run a meat export company.

***Second***, by all accounts, Mr. Aossey is a remarkably good, kind, and decent man – and has been throughout his life. Aside from the aberrant conduct that has brought him before the Court, Mr. Aossey's life has been characterized and defined by routine acts of kindness and devotion to not only members of his extended family but also to the Cedar Rapids community at large. Despite those good deeds, it is his remarkably active presence in the lives of his wife and five children that are most emblematic of Mr. Aossey's true character.

As the discussion below makes clear, Mr. Aossey is someone who has worked hard his entire life to be an asset to his community, to support his family, and to tirelessly give of himself to help others. That commitment and resolve remains present today.

In light of his personal background and the other forms of punishment that have already been visited upon him, we respectfully submit that a sentence of probation is more than "sufficient but not greater than necessary to comply with the sentencing goals set forth in the § 3553(a) factors." *United States v. Bravo*, 624 F.3d 921, 924 (8th Cir.2010). Such a sentence would also allow Mr. Aossey to continue his remarkable service to the community and continue to work hard to support his family. If, however, the Court determines that some period of confinement is required, we respectfully ask that the Court substitute a period of work-release and/or home confinement in place of imprisonment.

## II. JALEL AOSSEY'S BACKGROUND AND CHARACTER

The letters submitted to the Court from family, friends and colleagues on behalf of Mr. Aossey, attached to this submission as Exhibits B through Y totaling 38 sentencing letters[1], make plain and extol his compassion, his kindheartedness, and his sense of civic duty. All those who have come to know Mr. Aossey recognize these qualities in him, and it causes them to hold out Mr. Aossey as the premier example of how one should conduct himself. From these letters, it is clear that Mr. Aossey has touched countless people through his willingness to help those around him. Indeed, it is Mr. Aossey's strong moral foundation that underpins his standing as a true pillar of the community.

Quite clearly, for someone like Mr. Aossey who has demonstrated a lifetime commitment to helping others and serving as a role model to so many, the severe anguish he feels from letting down the people for whom he has been an inspiration has served as its own unique form of punishment. But even as the people in Mr. Aossey's life try to reconcile his transgressions, they cannot let his countless selfless acts and contributions to the community go unnoticed. As summarized in one letter to the Court:

---

[1] Exhibit Y is a Group Exhibit containing 14 letters to the Court not directly cited in this filing.

> Jalel has done a lot of humanitarian good. He has supported more charities than I can list here. He has also supported individual people…I really wish you knew Jalel, because if you did, I am certain that you would be lenient in sentencing. He has skills and experience that can be used very effectively in community service.

(Ex. D, S. Sayed Letter at 2).

### A. Jalel Aossey's Family and Upbringing

Jalel Aossey is now 41 years old. (Presentence Investigation Report, or "PSR," at 3.) He was born, raised, and still resides in the only home he has ever known, Cedar Rapids, Iowa. (*Id.* at ¶84). Jalel's family shares a rich and storied history with Cedar Rapids. Jalel's great grandfather immigrated to Iowa in the 1880s and his grandfather, Yahya William Aossey, first settled in Cedar Rapids in the early 1900s, as part of one of the oldest Muslim communities in the United States. As a child Jalel remembers peering over "old black and white photos of his grandfather on his horse and buggy selling wares to the "many farming communities across the state." (Ex. A, Jalel Aossey Letter to the Court at 1). Jalel's grandfather went on to become a successful businessman and, displaying the generosity characteristic of his family, donated twelve acres of land to what would become one of the first Muslim cemeteries in this country.

Jalel is the second child of William Aossey, Jr. and Naomi Aossey. Jalel was raised in a loving but disciplined household. Rukhsana Drahozal, who has known the Aossey family for forty years and babysat Jalel, remembers all of the Aossey children as "well behaved, kind, polite, and disciplined boys…quiet, respectful, and dutiful." (Ex. X, Drahozal Letter). Jalel's childhood friend, Jea Jung, remembers him as the "square" of the group: never going near "alcohol, cigarettes, or girls." (Ex. N, J. Jung Letter).

Indicative of his future disposition, Jalel's mother remembers her son not only as well-behaved and good natured, but especially courteous towards others:

> Whenever there was a fight in the neighborhood, or between his brothers, Jalel would intervene as a peacemaker. He would think of very creative solutions to

conflict, even giving up his own share to keep the peace.

(Ex. C, N. Aossey Letter at 2).

As the Court is aware, Jalel's father was involved in numerous charitable endeavors and activities that benefitted the community, and he instilled in Jalel those same values of civic service and generosity. Jalel would help his father with food drives and other community service projects related to helping refugees or other impoverished communities in the Cedar Rapids area. (Ex. V, Tarik Aossey Letter). But it was also on display through his everyday actions. As Mr. Jung explains, Jalel was known among his friends for being polite and respectful to elders "when it was not cool to be so," such as when he would shovel his neighbor's driveways without any compensation and without being told. (Ex. N, Jung Letter).

As relayed by his friend Humza Igram, even today, Jalel exhibits these same qualities and characteristics that immediately invites the esteem and admiration of the people around him:

> Some of Jalel's many good attributes include his forbearance, his patience, his calm nature, his ability to never get angry even under adversity, his polite and well-thought speech, his fair treatment of others and situations, his balanced and sincere approach, and his over-all excellent behavior.

(Ex. G, H. Igram Letter at 1). His friend, Hannah Elsayed, who served on the school board with Jalel, "knows him as the person that ends up resolving any conflict or misunderstanding that may arise, all the while staying calm and treating everyone dignity and respect." (Ex. Q, H. Elsayed Letter). Indeed, a close friend and business associate, Andrew Kidd notes, Jalel has continued to set a virtuous example to all of his:

> As I'm writing this thinking of Jalel's character and integrity, something struck me–I've never heard Jalel say a bad thing about anybody. Most people, even the best of them, occasionally say something offensive or in poor taste, whether joking or not. I cannot remember one instance where Jalel has said something offensive or in poor taste about anyone. Jalel is simply a good person with a good heart.

(Ex. K, A. Kidd Letter at 2).

Jalel's parents put a great deal of emphasis on education and, as such, he worked hard to graduate from Jefferson High School in Cedar Rapids with very high grades before attending his father's alma mater, Cornell College in Mt. Vernon, Iowa. (PSR at ¶89). One of Mr. Aossey's proudest achievements was, despite playing very little high school football, trying out for the football team, and through his resolve to become a better player, co-captaining the team to a division championship. (Ex. A, J. Aossey Letter at 3). However, the main focus for Mr. Aossey was always academics, recognizing not only his family's values but also their sacrifices:

> I took my academic life very seriously, probably more so then the average college student. I knew that my parents were paying for my college in full and learned early on that many students or their families were taking out large loans to pay for their education or that many students had to work outside of classes to pay for their education. My parents put a great deal of emphasis on our education and paid for everything, on the condition that I tried my best.

(Ex. A, J. Aossey Letter at 3).

Jalel graduated with a dual degree in physical fitness and international business in 1997, the latter major with an eye toward someday running the family businesses. (PSR at ¶90). And while Jalel did work as a financial planner for four years, he joined the company his father started, Midamar, in 2000. (Ex. A, J. Aossey Letter at 4, PSR at ¶93).

In 2005, Jalel married the love of his life, Surriah Igram. By that time, he was ready to settle down and start a family:

> We truly have a wonderful and loving relationship. We both shared the desire early on to have a big family and, eleven years later, we are truly blessed with five wonderful children, two girls and three boys.

(Ex. A, J. Aossey Letter at 3).

The Aosseys are very fortunate to have five children they love dearly: Jameela, age 10, Ayesha, 7, Ibrahim, 5, Muhummad, 3, Yusuf, 1. As with all exemplary parents, Mr. Aossey's character is perhaps best demonstrated by the values he has instilled in his children. Ms.

Igram's own father was largely absent during her childhood so it was very important to her to marry someone who would be a "kind, compassionate, giving, trustworthy and empathetic" father dedicated to raising children that were "healthy, confident, God loving individuals who will make a positive impact in the world." (Ex. B, S. Igram Letter at 3). Mr. Aossey, in turn, has made his role as a father his foremost and paramount concern:

> My wife did not have a positive father figure in her life so we both appreciate how important it is for children to have a strong fatherly influence. While I have always had a desire to develop and grow our businesses, I recognize that work/life balance critical. I decided early on that I would never sacrifice my family for my job. I will never allow my business pursuits to supersede the life I wish to have with my wife, children, or even my aging parents and in-laws. We must keep our families at the heart of our everyday lives.

(Ex. A, J. Aossey Letter at 3).

Even beyond being an extraordinary role model to his children, Mr. Aossey takes an exceptionally active role in raising them, given his myriad other responsibilities. This is made plain by the fact that nearly every letter written on his behalf – from family, friends, and even business associates – note fatherly acts they have personally witnessed. His neighbors attest to Jalel always being in his yard following his children around as they learn to ride bikes or playing nightly games of whiffle ball. (Ex. L, Carolyn Petersen Letter; Ex. M, Aaron Shaffer Letter). Even the other neighborhood kids enjoy going to "Uncle Jalel's house" because they know he will help them make "living room fortresses" or take them on a backyard adventure hunting for worms." (Ex. H, Uthala Abdhullah Letter at 1). Maybe most remarkable of all, he is able to balance the stresses of his family life with his unique patience, as noted by his brother-in-law:

> Despite the chaos that can occur with 5 kids in a household, I have never seen a more patient and caring father than Jalel. If one of [his children] misbehaves, he sits down with them and explains why what they did was wrong in a very gentle manner. I can tell he struggles to instill the same values of kindness and generosity towards others that he lives by.

(Ex. O, Ali Igram Letter).

As his wife explains, Jalel's strong Muslim faith is very important to how they raise their children:

> I grew up in a Muslim household and was taught the importance of selflessness, truthfulness, kindness, humility, compassion, generosity, empathy and many other values. My mother and grandmother really displayed these values and helped my siblings and I learn and act out these values. One of the reasons I married Jalel was because he upheld the same values as I did. We created this bond through marriage with the hopes of raising children who we could pass these values onto. We try to make it clear to them that these Islamic values are of the utmost importance and that nothing is worth sacrificing them.

(Ex. B, S. Igram Letter at 1).

In keeping with the traditions of his family, Mr. Aossey has contributed large amounts of his time, resources, and energies to the members of his community. Mr. Aossey was a founding member of the local Rotary Club chapter, and contributed towards other civic social projects such as helping underprivileged youth in the community and donating aid to newly settled refugees in parts of surrounding Iowa. (Ex. R, J. Osako Letter; Ex. W, Mohamad Khan Letter). He also took in a high school exchange student, who was so grateful for Mr. Aossey's kindness, she also wrote a letter to the Court on his behalf. (*See* Ex. P, Sibel Ezgil Letter).

Like his father, Jalel was involved both personally and through his company with food donation charities. A current employee, Mary Vavra, notes that though Mr. Aossey made food donations to "many charitable organizations," he did so "behind the scenes and with no fanfare." (Ex. J, M. Vavra Letter). When he heard about a charity event for the Wounded Warriors helping disable military veterans , he eagerly demonstrated his altruism:

> I approached Jalel asking if he would donate meat such as hot dogs for the event. I even explained to him how this was a Wounded Warrior event and many participants have been or are in the military and some might not be keen on a Muslim company supplying hot dogs, based on recent world events. He didn't even have to think about it–he eagerly agreed to donate as many boxes of hot dogs as we needed. He knew it was going to a good cause and he didn't care about people's prejudices.

(Ex. K, A. Kidd Letter).

As his kids grew, he started getting more involved with his children's schools. Several of the individuals who wrote letters on his behalf remember his tenure on the school board of his children's Montessori school, where he served as Treasurer. (Ex. F, K. Hale Letter at 1). As the director, Kristen Hale writes, his contributions took many different forms:

> Whether it be for a school fundraiser, or materials needed for a classroom, or assistance with moving furniture, or driving/chaperoning students on a field trip, or many other ways, I can always count on Jalel to help me/us out. In one situation we were trying to determine where we would find the money to purchase needed materials for the classroom and Jalel simply pulled out his credit card and said he'd take care of it.

(*Id*.).

Indeed, Jalel's kindness and generosity are on constant display through the everyday good deeds that are often taken for granted and generally go unnoticed. For instance, he still shovels his neighbors' driveways and helps them out with yardwork without asking or expecting anything in return, just as when he was a child. (Ex. T, Greg and LeAnn Gibson Letter; Ex. S, John and Colleen Simmons Letter).

Perhaps the greatest measure of his kindness, and certainly one mentioned by several of his friends and family, is the way in which he cares for his elderly mother. Mrs. Aossey is a survivor of breast cancer and has been in poor health over the last several years and Jalel has served as a caretaker, especially since his father's incarceration. (PSR at ¶80). As his mother writes:

> He makes sure that my needs are met here at the hospital. When he inquires about my condition or makes a request, the nurses and doctors respond and make accommodations for me. He made all the arrangements to bring me back to Cedar Rapids from Las Vegas in a medical airplane. He takes me to my doctor in Iowa City and Rochester MN. He also takes me out for lunch or breakfast sometimes. I feel and need his love and encouragement. I also need his help.

(Ex. C, N. Aossey Letter at 1). Despite all of his responsibilities and obligations – not to

mention the significant stresses attendant to consequences, both legal and personal, of his offense conduct – Mr. Aossey has made sure to put his mother's needs above his own. As his mother-in-law recounts in her letter:

> Just recently in April 2015 she fell and broke her neck and wrists. He worked tirelessly on the phone with doctors, insurance agents, hospitals to bring her back home to recover while he was dealing with many other issues last spring.

(Ex. D, Sara Sayed Letter at 1).

Indeed, Mr. Aossey and those around him worry about who will provide medical care for his mother should the Court sentence Mr. Aossey to any period of incarceration. As a friend of the family, Fatima Smejkal notes, the care that Mr. Aossey provides for her mother at this time is involved:

> I have seen them provide to and from transportation and physically carry her in a wheelchair up steps so she could attend a ladies coffee. The patience and devotion they give her on a daily basis is beyond words for me to explain. Mrs. Aossey is currently in a care facility and there is not a day that goes by that Jalel or his brother don't visit her and tend to her needs.

(Ex. U, F. Smejkal Letter at 1). Such devotion and kindness, while in many ways expected, is nonetheless commendable and representative of the true nature of Jalel Aossey's character.

In sum, Jalel Aossey is an extraordinarily kind, good, and decent man. He has worked hard, maintained his dignity and done everything he can to nurture and support his young family over the past five years while this matter has been looming, and he has served others whenever the opportunity to do so presented itself. He has lived a laudable life, and has the well-deserved love and respect of virtually all those who know him as a person

## III.    THE OFFENSE CONDUCT

Mr. Aossey's offense conduct is accurately summarized in the plea agreement and the stipulation of facts attached thereto. The following is intended to provide important context for Mr. Aossey's offense conduct in order to explain how a man so characterized by such integrity

became involved in a federal offense.

## A. Background of Midamar.

Mr. Aossey started working at Midamar in 2000. (PSR at ¶93). At the time he joined the company, Midamar was still very much is father's company and Jalel often struggled to assert his own direction:

> I knew that I would begin like anyone else – at the bottom… My father was the face of the company and the only point of contact for many of our international clients. I wanted to implement a more formal organizational structure to make sure we would be able retain and even grow the international market after my father left. But I knew I had to be careful. Even as I started gaining more authority in the company, there were several instances where I would try to implement new procedures or ways to modernize our infrastructure, only to get rejected by my father. Often, he would ignore my suggestions so I would focus on some other area of the company where I knew I could implement a change.

(Ex. A, J. Aossey Letter at 4).

Mr. Aossey's offense conduct is contrary to and quite aberrant from the manner in which he generally conducted his business affairs. His business associates and employees know him to be a caring and honest businessperson. For example, Gary Young, who has been working with Midamar for the last forty years as an insurance advisor, has seen Mr. Aossey's progress throughout the company. In his letter to the Court, he speaks glowingly of Jalel's consideration for his employees:

> You can learn a lot about someone by how they perceive the relationship with employees, and put it into action through the employee benefits. Jalel would take an interest in employees and their personal hardships and help them if he could. The HR person serving the employees was always looking out for the employees' best interests.

(Ex. E, G. Young Letter at 1).

Despite Midamar being a Halal food processing company, Midamar, and particularly Jalel, hired individuals of all faiths. A former employee of Midamar, Von Kennedy, remembers his interview with Mr. Aossey:

I shared with Jalel that I was a strong Christian and asked if this was going to be an issue in any way (since Midamar was owned by Muslim family). He said he appreciated my sharing this and that my faith was actually an asset due to my firmly held values and principles.

(Ex. I, V. Kennedy Letter).   Mr. Kennedy remembers seeing those values in action on the several business trips he took with Mr. Aossey:

I found Jalel to be honest, pursued mutual understanding and win-win scenarios (sometimes giving above and beyond what might be expected) in his dealings with customers. I never saw him take advantage of a customer and saw him meet at least halfway in solving a problem even if a customer was primarily at fault. I saw him as a good man as he acted devout in his Muslim faith and often talked about how he wanted to help his customers, grow his business, and how he missed his family.

(*Id.*).

Yet, even as Jalel progressed through the company and started gaining more responsibilities, his father often thwarted his efforts.   As Mr. Young, who knew both Jalel and his father, observed:

Jalel had good business ideas and instincts, but was always set back by his father's dominance and unwillingness to let go of control. This is not at all uncommon of family businesses. Jalel would take two steps forward and he would be set back by something his father would do. His father managed by personality for many years and setting up structures and chains of responsibility did not come easy for him.

(Ex. E, G. Young Letter at 1).

## B.     Participation in the offense conduct

As the PSR report makes clear, Mr. Aossey's offense conduct involved two separate acts: (1) a failure to stop the misbranding of exported beef products and (2) a failure to amend or correct the company's website misrepresentations after he authorized the relaxation of previously stricter standards for Halal slaughter.   (*See* PSR starting at ¶35 and 47, respectively).

### 1.     Misbranding

The misbranding began in 2007, well before Jalel Aossey was ever aware of what was

going on.   One of Midamar's halal beef suppliers was failing to meet Midamar's demand for exports to Malaysia and Indonesia.   J.F. O'Neill was a "smaller custom kill facility" and often had issues with low beef production.   In contrast, PM Beef was a "traditional religious slaughter facility" capable of processing more cattle for slaughter.   PM Beef and J.F. O'Neill were both fully certified as proper Halal slaughterhouses prior to the Mad Cow Disease outbreak in the early 2000s.   Once the export ban was lifted, *circa* 2007, the countries sent representatives to re-certify J.F. O'Neill.   However, P.M. Beef was not re-certified because "it experienced a mechanical issue at the time of the inspection."   (Ex. A., J. Aossey Letter at 5).   Therefore, in response to shortages in Halal beef supply, Midamar took P.M. Beef and repackaged it in Midamar boxes with containing the federal mark of inspection for J.F. O'Neill.   (PSIR at ¶37).

The misbranding conduct was implemented under the direction of Jalel's father, Bill, in 2007, and continued for almost two years before the conduct came to Jalel's attention.   That fact is not in dispute.   (PSR at ¶37, 42).   During the time, Jalel's primarily responsibility at Midamar was domestic marketing and his father oversaw the export business:

> The operations side of the company, the guys who ran our warehouse, handled all of our export consolidation practices to make sure the meat from our suppliers got to our customers overseas.   I had almost no knowledge of the warehouse operations and the occasional times I would walk through there, what I saw did not seem improper.   It was only after seeing it a few times and registering the oddity of the operations guys taking meat from one box and moving it to another that I began to pay attention.

Jalel candidly recounts how in the Spring of 2009 he came to learn of these activities and how he foolishly and quite regrettably rationalized the misconduct:

> I recall roughly in the Spring of 2009, that I started noticing that our warehouse employees were taking meat out of one box and placing it in another… I confronted warehouse staff and asked them to explain what was going on.   That is when I understood the issue…As soon I understood what was happening, I should have demanded they immediately stop it.   I knew that this was dishonest. I tried to rationalize the effect of these actions, hoping that I could justifiably rely on our warehouse managers and employees, that they must know more than me.

> But, truthfully, I understood fairly quickly that Midamar was clearly doing something wrong. At the time, I also hesitated to overstep my father's authority. Looking back now, I realize that is a poor excuse, especially considering my position in the company.

(Ex. A, J. Aossey Letter at 4-5). Having looked to his father for direction in all facets of life, business decisions paramount, Mr. Aossey understandably had difficulty questioning, let alone contravening, his father's management of the company. But Jalel knows that in no way excuses his conduct and readily admits that it was his duty to as a director of the company, to "physically and verbally to correct the matter." (*Id.*).

While Mr. Aossey is certainly blameworthy for allowing and accepting the continued misbranding, he was also the driving oar in instituting the proper reforms at Midamar:

> I gathered our staff together to sit with the OPEER investigators and tell everyone that we would make it right and take the necessary steps to correct our past errors in judgement and earn back the trust of USDA. I personally took it upon myself to be the main point of contact between Midamar and the various USDA and OPEER representatives.

(Ex. A, J. Aossey Letter at 5). Under instructions from the USDA to have Midamar get a compliance program in place, Jalel Aossey personally wrote the entire export compliance plan because he felt "that if the company was to show its reengagement was serious and thorough, it needed to come from the very top of the organization." (*Id.*). Thus, it was due largely to Jalel's sincere efforts that sixteen months after shutting down Midamar's export business, the USDA approved of the remedial measures spearheaded by Jalel and, therefore, reinstated Midamar's export license. However, as Jalel writes in his letter, his accomplishments in this regard are bittersweet, at best, since they went to correct problems for which he shares the blame.

2. Website Misrepresentations

Mr. Aossey also takes responsibility for misrepresentations that remained on Midamar and ISA's websites that inaccurately described the Halal slaughter for certain Midamar meat

exports.    As Jalel explains in his letter, Midamar's goal in explaining its slaughter practices was to stand out as a Halal exporter:

> Midamar always wanted to differentiate itself among the various food producers claiming to be Halal.   We always took great pride in adhering to the strictest Halal standards, something we felt a lot of other companies calling themselves Halal were not doing.   Early on in the development of the website, we set forth some of the various ways that Midamar's Halal standards and products were stricter than other products calling themselves Halal.

(Ex. A, J. Aossey Letter at 6).

The circumstances for the misrepresentations arose when Midamar had to fill large orders of Halal flank steak.   Due to several factors, Midamar could not fulfill flank steak orders adhering to the stricter Halal slaughter practices detailed on the websites.   After careful consideration, Mr. Aossey reached to the conclusion that he would supply flank steak processed under less strict Halal slaughter practices:

> …I started doing more research into the Halal slaughter practices of our various meat suppliers and seeing if there were other meat providers we could rely on. As I studied and analyzed the problem, I started looking into using meat that was slaughtered under other processes and whether those conformed to the Halal standards of UAE and Kuwait.

(Ex. A, J. Aossey Letter at 6).   Over the course of time, Jalel came to the conclusion that meat slaughtered under lessened standards would still satisfy and meet Halal requirements:

> For example, we came to the conclusion that it was acceptable to use either a percussive, non-penetrating stun gun or a penetrating captive bolt stun gun during the slaughter process so long as before such stun gun is used, the cattle is slaughtered by cutting the animal's trachea, esophagus, and jugular veins with a horizontal cut across the neck.   Moreover, we concluded that Jewish or Rabbinical Slaughter satisfies Halal requirements and that cattle need not be slaughtered by a Muslim slaughterman only, so long as the slaughter is performed by a Jewish slaughterman.   Similarly, we no longer thought it was necessary that a "Tasmia," or Muslim blessing, be recited after every slaughter if the slaughter was conducted by a Jewish slaughterman observing Kosher law.   **I still sincerely believed that the flank steaks we were shipping to those countries was Halal**…We slowly came to the decision that the meat did not have to adhere to every single Halal practice listed on the website.   But rather than update the website to reflect those changes, we simply left those statements unchanged.

(Ex. A, J. Aossey Letter at 6-7 (emphasis added)).

In a regrettable lapse in judgment, Jalel failed to amend and update the website to reflect

Midamar's and ISA's new practices and philosophies with respect to Halal:

> Many of our marketing materials maintained a very general overview of Halal but the website dug deeper into the slaughter processes and practices. They made representations about what practices we condoned. Some of our beef did conform to those practices but some of those exports to UAE and Kuwait did not. The reality was that as a leader of the company, I was responsible for a message about our slaughter practices, and the slaughter practices described on the website did not properly describe the meat we were providing to our customers.

(Ex. A. J. Aossey Letter at 7).

As Mr. Aossey notes in his letter, he never believed he was sending any non-Halal

products labeled as Halal, a truly unconscionable act prevented by his faith, his upbringing, and

his respect for all Muslim people:

> Your Honor, I want to stress again that at no time, then or now, did we ever believe our company was selling non-Halal beef as Halal. My faith is of great importance to me and I believe we are firstly accountable to God for our actions and then to all others. I am also extremely respectful of other cultures and know that many Muslims have different customs. I would never sell them a product that I did not think conformed to Halal practices. Knowing that my business serves a purpose in fulfilling the dietary needs of a particular consumer base is important to me and thus my concern from day one was to ensure the product I sold or represented to others conformed to the religious standards that both we believed and they believed were acceptable.

(Ex. A., J. Aossey Letter at 7).

Fortunately for Mr. Aossey, Midamar, and ISA, the actual effect of these

misrepresentations appears to have been minimal. The Halal shipments identified in the

indictment that did not conform to the stricter Halal standards represented on the website,

namely those to the United Arab Emirates and Kuwait, went entirely to a single customer – *and*

*that customer was aware of Midamar's slaughter practices and accepted them as Halal*. (Ex.

A, J. Aossey Letter at 7). Furthermore, as of this submission, Mr. Aossey is not aware of any

actual customer or consumer that has come forward and expressed any actual harm as a result of the misrepresentations.

Nonetheless, Mr. Aossey acknowledges and accepts full responsibility that the website representations failed to accurately not articulate the company's position on Halal and its products:

> In retrospect, the result of my actions had the potential for consumers to be misled as to what practice was being followed and whether that practice was consistent with their own beliefs. I truly regret that and offer a heartfelt apology to anybody and everybody those representations may have affected.

(*Id*.).

## IV. AFTERMATH OF THE OFFENSE

### A. The Personal Toll

The gravity of this situation has been plain and ever-present in Mr. Aossey's life for the past four years since the start of the investigation. Mr. Aossey cannot adequately express his remorse, especially to those near to him:

> [M]y failure to take the action resulted in the potential for tarnished trust in my own abilities in the eyes of my industry colleagues and staff, and disappointment from my family and friends who have known me to be a person of strong character and honor. I personally have been burdened with the stress of living through the last five years thinking about the ones I have hurt, including those most dear to me: my wife, children, mother, staff, and close family and friends. They have either had to express doubt in who they believe I am or what I stand for or share heavily in the stress by having to explain to others their affiliations with me. Families normally have enough stress in their everyday lives but all of this has been a very public indictment of me as a husband and a father.

(Ex. A., J. Aossey Letter at 7-8).

Mr. Aossey's wife has also seen first-hand the toll the past few years have had on Jalel. Yet she also has seen that Jalel has dealt with this enormous burden with the compassion and dignity that has long defined his character:

> This has also been enormously stressful on Jalel. He does say once in a while

that he can't imagine being away from us. However, he isn't the type to get depressed about his own problems. He is trying so hard to look for solutions and ways he can cooperate. Even though he is going through so much stress, he has still maintained his same calm and collected composure, and I feel this experience has only made him a better person who is more committed to his family and devoted to God. When he was going through the plea negotiations, it was during the month of Ramadan, where we have to fast from sunrise to sunset for about a month. This is the first year he has ever gone to pray every night after fasting all day. I just really think he is trying to improve himself in every way.

(Ex. B, S. Igram Letter at 3).

Jalel describes the anguish of the last few years bred from the uncertainty of the future as its own unique form of torture on him and his family:

But most of all, I have had to suffer through the uncertainty. As we move into the sixth year of his ordeal, the drain on my reputation, my family, and even my finances is starting to take its toll. I also know that the worst is yet to come. I generally try to stay positive and immerse myself in my work and responsibilities. I can distract myself by working with the companies and taking caring of my wife and five children. But my mind will often wander to a future where my children, especially my two oldest girls, have to live apart from their father. I worry how my children will grow up in their formative years without having their father around. Even seeing what my father has had to endure in going to jail – and knowing that I could have had some part in preventing it – is quite painful.

(Ex. A, J. Aossey Letter at 8).

But Mr. Aossey's convictions and principles require him to take action and remedy the problems of his own doing. Thus, since the time of the investigation in 2012, continuing through the time of his own indictment in in September 2014, Mr. Aossey has had one goal: to save Midamar and ISA. To many this would seem a Sisyphean task given the steep decline in profits for both companies following the indictment and the sharp decline in customers. For example, the Aosseys have used distributions from the profits of ISA fund operations of Midamar. (PSR at ¶?). But, as recounted by his wife, Mr. Aossey's resolve has never flagged:

He has spent a lot of time away from his family to try and fix his mistakes at Midamar. I have been supportive towards that because I want the children to see, if we make a mistake that we do our best to try and work things out. Jalel and I talk about this experience and reflect on it almost every day. We are sincerely

> trying to constantly improve ourselves and restore our reputations in the community. We want to make a positive difference in the world by raising healthy, confident members of society and we are willing to admit our mistakes, learn from them, and better ourselves.

(Ex. B, S. Igram Letter at 3).

As a condition of their plea agreement, Midamar, ISA, and Mr. Aossey were jointly and severally liable to forfeit $600,000. Notably, despite the uncertain financial situation of the business entities, the Aosseys secured substantial financing to promptly pay the entire $600,000 in advance of sentencing. (*See* dkt #195, Order Granting Payment of $600,000 to U.S. Attorney's Office).

Yet true to his character, Mr. Aossey has resolutely undertaken the difficult task of putting his life back together and trying to save his family's company. As explained above, after understanding the error of his ways, he has been quick to take remedial actions to secure Midamar's and ISA's future. While many others might simply would wash their hands of the companies, Mr. Aossey has felt a strong personal conviction to work to save the companies, not only for the legacy of the entire Aossey family but also for the many Cedar Rapids family members that Midamar and ISA still employ.

To his credit, Mr. Aossey sees all of this as a learning opportunity for himself and his children:

> I try to teach my children about faith, honesty, accountability, and forgiveness not through lesson plans but through my own example. Persevering through these past few years, and speaking to my family about the challenges we have faced, I have tried to focus on the future positive. I try to show them that I am sincerely regretful and apologetic. I explain to them that I am human and have to accept my mistakes. I sometimes get mad at this situation but when I sit back and analyze it, the finger points back to me. I use that to hold myself accountable, and have faith that tomorrow will be a better day if I choose to believe it. I choose to use this experience to teach my children that we must never be so discouraged that we give up, and we must also never be so self-righteous to believe we have done no wrong and that the world is simply against us.

(Ex. A, J. Aossey Letter at 3-4).

**B.  USDA Consent Decree and Divestiture**

Finally, as part of the plea agreement, Midamar has entered into a consent decree with the USDA to comply with numerous conditions.   Per the agreement with the USDA, in order for Midamar to maintain ongoing operations it was required to complete the following actions prior to its sentencing: (1) update and restructure the company's executive management; (2) create business ethics policies and training; (3) refresh export compliance plans; (4) implement further separation of responsibilities; and (5) ensure food safety programs are up to date.   Midamar has completed all of the above requirements and continues operating today with the intention to rebuild its business.

Also, as per the terms of the consent decree with the USDA, Jalel Aossey agreed to dissociate and divest from Midamar and another food processing company under the USDA's jurisdiction, Halal Food Processors, a company he founded in 2008.   He has done exactly that. Given the strong familial ties to Midamar and his personal history with the company and the food processing industry for the last fifteen years, this is no small penalty:

> I have grown up and spent almost all of my working career in the food industry, and I wholeheartedly believed I would continue up to the time that I handed off the business to one of my children.   The food industry for me is not only a business but building lasting relationships here and abroad with people who literally saw me grow up. I am truly disappointed at losing the opportunity to be a meaningful part of Midamar – my family's company – as it grew and prosper in the years to come.   I do not doubt that I will find another job but it will be difficult to overcome the loss of my identity.

(Ex. A, J. Aossey Letter at 8).   As Mr. Kennedy succinctly describes, leaving Midamar "cuts to [Jalel's] core."   (Ex. I, V. Kennedy Letter).   Mr. Aossey formally resigned as a Director of Midamar in November 2015 and, after transitioning his role to new management, he will fully dissociate from Midamar by the time of his sentencing.   Indeed, one of Mr. Aossey's finals acts

as an executive of Midamar will be to represent the company at its sentencing hearing.

Of course, the most difficult aspect of this whole ordeal is the thought of Mr. Aossey being away from his wife, children, and mother as a result of a sentence involving any period of incarceration.  His wife is terrified at the thought:

> These past five years have been the worst of my life, much worse than when my father left my mother. I really try and be strong for everyone but it is really hard. Jalel and I really are best friends as much as husband and wife. To lose him would mean I would lose half of myself. I don't think I could ever express how afraid I am for my children and me living without him.

(Ex. B, S. Igram Letter at 4).

## V.    MR. AOSSEY'S SENTENCING REQUEST

Mr. Aossey's Memorandum In Support of His Motion For a Variance makes clear why a sentence of probation is "sufficient, but not greater than necessary" to accomplish all of the sentencing goals set forth in 18 U.S.C. §3553(a).   In this particular case for this particular man, a term of imprisonment is not necessary to satisfy the goals of punishment and deterrence. Additionally, Jalel Aossey's history and characteristics plainly establish that he poses absolutely no threat to the public and no threat of recidivism.   A term of probation is both appropriately punitive and would not create a sentencing disparity among individuals who committed food processing related violations.   And finally, there is no dispute that this case constitutes the lone blemish on Mr. Aossey's otherwise exemplary life. A sentence of probation is by far the most appropriate and reasonable sentence given Mr. Aossey's extraordinary history and personal characteristics.   Thus, we respectfully request a sentence of probation for Mr. Aossey. However, if the Court determines that a term of incarceration is warranted, we respectfully and humbly submit that in lieu of imprisonment, a period of work-release and/or home confinement of whatever length the Court deems appropriate is both reasonable and sufficient.

Dated: February 8, 2016                       Respectfully submitted,

*/s/ Marty Basu*_____
An Attorney for Defendant Jalel Aossey

Theodore T. Poulos
Marty Basu
Cotsirilos, Tighe, Streicker,
     Poulos & Campbell
33 North Dearborn Street, Suite 600
Chicago, Illinois   60602
(312) 263-0345

CERTIFICATE OF SERVICE
I certify that I electronically served a copy of the
foregoing document under EDMS to which this certificate is
attached to the parties or attorneys of record
on Feb. 8, 2016.
*By: /s/ Marty Basu*